New York Bank Note Company, Respondent and Appellant, *v.* Hamilton Bank Note Engraving and Printing Company and The Kidder Press Manufacturing Company, Appellants and Respondents.

*Agreement for a monopoly of the use of a certain kind of printing press — action to prevent the sale of such presses to another company — measure of damages — assignability of such agreement by one corporation to another created to continue its business — laches.*

The Kidder Press Manufacturing Company entered into a contract with the New York Bank Note Company, by which it guaranteed to the latter a monopoly for twenty years of all future machines built on the lines of its patents, upon which strip tickets could be printed, and agreed to sell Kidder perfecting presses only to their order or by their consent, the purpose being to protect the bank note company from competition by anybody in the manufacture of strip tickets, and in order " to protect the interests of the Bank Note Company in and to the proper control and ownership hereby acquired in the Kidder perfecting press," the contract provided " that whatever sales of this press or presses are made by the Kidder Press Company shall be made to the New York Bank Note Company for the account of the party desiring to use the press or presses, and the New York Bank Note Company shall execute a perpetual lease to said third party for such money as the Kidder Press Company shall nominate; but the New York Bank Note Company shall in no wise part with the title in and to the machine delivered, but shall retain its actual ownership of the press or presses under agreements permiting its use for all purposes, except strip tickets, within the United States."

Subsequently, the New York Bank Note Company, a New Jersey corporation, assigned its interest in this contract to the New York Bank Note Company, a corporation at that time organized under the laws of West Virginia, and immediately thereafter the New Jersey corporation was dissolved, the stock of the new company being ratably distributed among the stockholders of the old one, whose assets and business passed to the new company, which, so far as appeared, enjoyed the same charter rights, and, although the new company was technically a distinct legal entity, yet, to all intents and purposes, it was the same concern as the old one.

The Kidder Press Manufacturing Company knew of the contemplated transfer of this contract, both before and after it was made, but took no steps indicating its disapproval until the present action was brought against it and the Hamilton Bank Note Company to restrain the latter from using certain presses, similar to the one covered by the contract, which it had purchased directly from the Kidder Press Manufacturing Company for the purpose of printing strip tickets, and to restrain the Kidder Press Manufacturing Company from selling such presses, and for an account of profits derived by the Hamilton Bank Note Company from the use of such presses for such purposes.

*Held,* that while as a general rule rights arising out of contract cannot be transferred, if they are coupled with liabilities, yet, as in the present case, the contract was only technically, but not practically, assigned, the new company being to all intents and purposes the old one, the assignment was valid;

That the question of assignability was one of intent to be deduced from all the circumstances of the case, and that where the terms and subject-matter of an agreement left the question in doubt, it would seem that extrinsic proof might be resorted to in its determination;

That the purpose of such contract being to give to the New York Bank Note Company a monopoly for twenty years of the Kidder Press Manufacturing Company machines, upon which strip tickets should be printed, and to cover the sale of the Kidder press, with or without attachments for printing strip tickets, the Hamilton Bank ·Note Company, in purchasing a press without such attachments, with knowledge of the restriction existing as the result of the contract between the other companies, became liable for the damages which it inflicted upon the New York Bank Note Company in its use of such press for printing strip tickets; but that in view of the fact that there were other means of printing strip tickets, the measure of damages was the gain resulting from printing such strip tickets on the Kidder presses in· question, instead of on any other press purchasable elsewhere, or capable of being manufactured by parties other than the Kidder Press Manufacturing Company. ·

*Semble,* that if the Hamilton Bank Note Company had purchased the machine without notice of the contract between the New York Bank Note Company and the Kidder Press Manufacturing Company, it would have acquired an unrestricted right to its use, which would not be affected by knowledge thereof subsequently acquired.

*Semble,* that the element of personal trust is not involved in dealing with an ordinary business corporation, for the reason that such corporation has no personality to receive the trust — its board of directors, and even its managing officers, being liable to shift at any moment.

*Semble,* that the New York Bank Note Company was not the sales agent of the Kidder Press Manufacturing Company in the ordinary sense.

What delay in bringing such an action will not constitute a bar to its maintenance, considered.

Patterson and Rumsey, JJ., dissented.

Appeal by the defendants, the Hamilton Bank Note Engraving and Printing Company and another, from an interlocutory judgment of the Supreme Court, entered in the office of the clerk of the county of New York on the 13th day of September, 1897, upon the decision of the court rendered after a trial at the New York Special Term; also from said interlocutory judgment as amended and entered in said clerk's office on the 4th day of October, 1897; also an appeal by the plaintiff, the New York Bank Note Company,

from the said amended interlocutory judgment in so far as the same restricts plaintiff's injunctive relief as against the Hamilton Bank Note Engraving and Printing Company to the two Kidder perfecting presses, purchased from The Kidder Press Manufacturing Company subsequent to October 12, 1891, and any other Kidder perfecting press purchased since January 1, 1893, and does not extend to all Kidder perfecting presses purchased, or to be purchased, since October 12, 1891, and does not extend to the attachments for strip ticket printing, made or repaired by The Kidder Press Manufacturing Company when used on any press, and in so far as it restricts plaintiff's damages to the profits made by the Hamilton Bank Note Engraving and Printing Company in printing strip tickets on the two Kidder perfecting presses purchased from The Kidder Press Manufacturing Company, since the repairing or rebuilding of the attachments added to the first press by The Kidder Press Manufacturing Company.

The action is brought for an injunction restraining the defendant, Hamilton Bank Note Engraving and Printing Company, from using printing presses which it has purchased, or may purchase, from the defendant Kidder Press Manufacturing Company, for the purpose of printing what are known as strip tickets, and restraining the Kidder Company from selling the same, and for an accounting of the profits derived by the Hamilton Company by the use of such presses for such purpose.

It appears that the Kidder Press Manufacturing Company, of Boston, Massachusetts, was the manufacturer of a certain kind of printing press, called the Kidder Perfecting Press, and an attachment, upon which strip tickets, such as are used by the elevated railroad and ferry companies, can be printed, and that the New York Bank Note Company, a New Jersey corporation, and the predecessor in business of the plaintiff, had purchased one of such presses with the improvements and attachments, which it used in the manufacture of such strip tickets. Its principal customer for the purchase of strip tickets was the Manhattan Railway Company, with whom it had a valuable contract to supply tickets, which did not expire until April 1, 1893. On October 12, 1891, the said bank note company entered into a written contract with the Kidder Company for the purchase of another such press and attachments, having

various modifications and improvements. It was negotiated between Mr. W. P. Kidder and Mr. George W. Kendall, representing, respectively, the Kidder Company and the New York Bank Note Company. By such agreement the Kidder Company guaranteed to the said bank note company a monopoly for twenty years of all future machines built on the lines of its patents upon which strip tickets could be printed, and agreed to sell Kidder perfecting presses only to their order or by their consent, the purpose being to protect the bank note company from competition by anybody in the manufacture of strip tickets. The contract further provided: " It is hereby agreed and assented to by the Kidder Press Company and the New York Bank Note Company that the most feasible and proper way to protect the interests of the Bank Note Company in and to the proper control and ownership hereby acquired in the Kidder Perfecting Press * * * is, that whatever sales of this press or presses are made by the Kidder Press Company shall be made to the New York Bank Note Company for the account of the party desiring to use the press or presses, and the New York Bank Note Company shall execute a perpetual lease to said third party for such money as the Kidder Press Company shall nominate; but the New York Bank Note Company shall in no wise part with the title in and to the machine delivered, but shall retain its actual ownership of the press or presses under agreements permitting its use for all purposes except strip tickets, within the United States. * * * And this form of agreement, as substantially set forth herein, it is hereby agreed by the Kidder Press Company shall be used in whatever sales are made of its Perfecting Presses. And the New York Bank Note Company shall deliver to the Kidder Press Company the full consideration it (the Press Company) may nominate, and the Bank Note Company shall have its own agreements with the purchaser in accordance with the above plan, and litigate at the Bank Note Company's own expense the agreements with said purchaser or purchasers if the agreements are broken."

On December 27, 1892, the New York Bank Note Company, the New Jersey corporation, assigned its contract with the Kidder Company to the plaintiff, the New York Bank Note Company, which had been organized under the laws of West Virginia, and on December 30, 1892, the said New Jersey corporation was dissolved. Mr.

Kendall testified that, at the time the contract with the Kidder Company was made, he informed Mr. Kidder of the intention of the New Jersey company to take out a new charter under the laws of West Virginia and to transfer all property of every description whatever to the new company, and read to him a resolution to that effect, passed September 4, 1890, and asked if it would be the same to him if the contract was carried out with the company which the resolution had in contemplation, and that Mr. Kidder replied, yes, that the press would not be delivered until the new company was in existence, and that it was entirely satisfactory to his company to have the contract carried out with the successor company. There is no evidence that any of the other officers or directors of the Kidder Company were aware of the contemplated dissolution of the New York Bank Note Company and its reincorporation at the time the contract was made, but it appears that afterwards the fact of such dissolution was discussed in the board meetings of the Kidder Company and was an influence in determining their subsequent action in their transactions with the Hamilton Company.

Subsequent to the contract of October 12, 1891, but prior to the dissolution of the New Jersey company, the defendant Hamilton Company purchased from the Kidder Company a perfecting press similar to the one covered by the contract between the New Jersey corporation and the Kidder Company, except that it did not have the strip ticket attachment. This press was shipped on December 29, 1892. The sale was made directly to the Hamilton Company and not through the agency of the New Jersey corporation.

About the 1st of July, 1892, one C. E. Gray, who had been formerly connected with the New Jersey Company, and had signed on its behalf the contract of October 21, 1891, became vice-president of the Hamilton Company, and on April 29, 1893, assumed the management of its business. In November, 1892, the Hamilton Company secured the Manhattan railway contract for the manufacture of strip tickets, and the plaintiff's contract for that work was not renewed. In order for the Hamilton Company to furnish tickets in the quantities required by their contract, a machine with a strip ticket attachment was necessary. Accordingly, they had an attachment made and applied to the Kidder press recently purchased, which enabled them to print strip tickets. This got out of

repair in August, 1893, and the Kidder Company in that month repaired it. Negotiations were also entered into for the purchase of another press from the Kidder Company, adapted to the printing of strip tickets. On June 15, 1893, the Hamilton Company passed a resolution authorizing the purchase from the Kidder Company of a strip ticket printing press " similar to the press now in use by the New York Bank Note Company." A contract for the purchase of such a press was entered into with the Kidder Company on June 21, 1893, and the press thus purchased, with attachments complete, was shipped in September, 1893.

At the time of the purchase of these two presses by the Hamilton Company it was aware of a contract between the Kidder Company and the plaintiff restricting the sale of perfecting presses. Mr. Kendall testified that within ten days after the contract of October 12, 1891, was signed he told Mr. Seebeck, the president of the Hamilton Company, that he had bought control of the Kidder patents and of the presses as improved by strip ticket attachments, and that he read to him the contract with the Kidder Company, with the exception of the consideration. Mr. Gray, who had signed the contract on behalf of the plaintiff, afterwards became an officer of the Hamilton Company and conducted many of the negotiations for the purchase of such presses. Mr. Kidder also told Mr. Seebeck, before the Hamilton Company bought its first press, that the Kidder Company had a contract with the plaintiff which prevented the sale of a strip ticket machine to the Hamilton Company. By a letter dated November 28, 1892, a month before the delivery of the first press, Mr. Seebeck, as president of the Hamilton Company, wrote to Mr. Kidder as follows : " Kindly advise us at once whether your obligations prevent you from selling us any of your presses, or whether it refers *only to the perfecting press*." And on January 13, 1893, the Kidder Company addressed a letter to the Hamilton Company, which was signed " The Kidder Press Manufacturing Company, W. P. Kidder, E, Treasurer," referring to an interview between the writer and Mr. Seebeck in regard to supplying the Hamilton Company with an attachment for its Kidder press, in which the following language was used : " We should be very glad to fill such an order for you if we could feel free to do so, but in view of our contract with the N. Y. Bank Note Co., it would place us in a compro-

mised position, liable to damages, since altogether, with the perfecting double quarto press recently furnished you, the mechanism could be so easily combined to constitute a duplicate of the Kendall machine. Ready to serve you in any capacity in our power, outside the Kendall obligation, we remain," etc.

The court decreed that the defendant Hamilton Company be restrained from using the two aforesaid Kidder perfecting presses, or any press known as the Kidder perfecting press, purchased since January 1, 1893, for strip ticket printing; that the Kidder Company be restrained from selling any of its Kidder perfecting presses, with or without strip ticket attachments, except under valid restrictions against their use for strip ticket printing, and unless the same were made to pass through the plaintiff's hands in pursuance of its contract; that the plaintiff recover from the defendants, as damages, the profits made by the Hamilton Company upon the strip tickets printed by it upon the two aforesaid presses since the repairing or rebuilding by the Kidder Company of the attachments added to the first press purchased; that the Hamilton Company account to the plaintiff for the profits made by such defendant upon the tickets printed by it or others for its account upon either or both of the presses purchased from the Kidder Company, and that it be referred to a referee to compute the damages and state the account as against both defendants, and that on the coming in of his report the plaintiff have final judgment for the amount of such damages. From such judgment both defendants appeal. The plaintiff appeals from so much of the judgment as limits its damages to the profits made in printing strip tickets on the two presses from the time when the Kidder Company repaired or rebuilt the attachments added to the first press, and does not extend to the attachments made or repaired by the Kidder Company when used on any press.

*Edward P. Lyon,* for the plaintiff.

*William L. Turner,* for the Hamilton Bank Note Engraving and Printing Company.

*Victor J. Loring* and *W. T. B. Milliken,* for the Kidder Press Manufacturing Company.

O'BRIEN, J. :

In the case of *The New York Bank Note Company* v. *The Hamilton Bank Note Engraving & Printing Company*, upon the cross appeals from portions of an interlocutory judgment sustaining the defendant's demurrer to the complaint on the ground that it failed to state facts sufficient to constitute a cause of action, many of the questions again pressed upon us were disposed of. (83 Hun, 593.) As correctly summarized in the syllabus : " If a person purchases from another a printing press, having knowledge of the existence of a contract between the vendor and a third person, whereby the vendor has agreed not to sell such presses except under certain restrictions, such third person is entitled to enforce his contract as against the vendee, and in an action brought for that purpose is not bound to make any tender. Contracts prohibiting the use of personal property in a particular way are valid." It was further held that in such an action the Kidder Press Manufacturing Company was a proper party, entitled to be heard, because it involved the question of its right to deal with its property. The Kidder Company was accordingly brought in by an amended complaint, and it now raises the objection that, although it appeared in the action and the case was tried upon the merits and a judgment rendered, the court was without jurisdiction. Apart from the consideration of its actual presence in the litigation and its vigorous contest of the plaintiff's right to relief, which would seemingly make this a late day to raise the question of jurisdiction, it was made to appear that the contract between it and the plaintiff was made and signed in New York ; and, therefore, although both were foreign corporations, the court acquired jurisdiction.

The Hamilton Company insists that the plaintiff's acquiescence and *laches* in bringing its action, after full knowledge that the Hamilton Company was purchasing, or about to purchase, machinery and plant for the purpose of printing strip tickets, is a bar to any relief, upon the principle that, " where the summary interference of a court of equity is invoked, it must be invoked promptly," which principle has been applied in cases where parties have lain by and permitted large expenditures to be made in contravention of the rights for which they contend. While the soundness of such a rule is not disputed, it is not

applicable to the facts here appearing. The first press purchased by the Hamilton Company was delivered in December, 1892, and on January 30, 1893, as appears by a letter of the plaintiff's president, he knew that the Hamilton Company was attempting to secure a plant for strip ticket printing. The most that can be said, therefore, is that after the first machine was purchased the plaintiff had knowledge ; and, as to the second machine, it has been found that the Hamilton Company purchased it with full knowledge of the plaintiff's rights and in hostility thereto. Hence, what was said in *Beal* v. *Chase* (31 Mich. 533) is here applicable : " *Laches* is a most important circumstance where parties are proceeding to expend money in reliance upon a supposed right and upon the apparent acquiescence of the party who might question the right. But in this case defendants were misled by no acquiescence. They entered upon their undertaking in open and known hostility to the complainant, and in reliance, not upon his acquiescence, but upon their ability to defeat him in a legal contest. They knew from the very first that their position in respect to this contract must be antagonistic to that of complainant, and no consideration of good faith on his part could require that he should open the legal warfare at the very earliest opportunity. When a hostile attitude is thus taken the challenged party may justly be expected, and reasonably be allowed, to be wary and deliberate in choosing his time and opportunity for attack. * * * He might have moved sooner, but the law does not demand the utmost exertion of diligence in repelling a hostile invasion of one's rights thus deliberately undertaken with full knowledge of all the facts."

The next question presented is as to the assignability of the contract of October 12, 1891, and as to the right of the plaintiff, as successor to the former company, to maintain an action upon it. It is insisted that it was not assignable, either by its terms or in its nature ; that the assignment vested the plaintiff with no rights as against either defendant, and that upon the dissolution of the plaintiff's assignor whatever rights it may have possessed died with it. In regard to the first press, which was purchased by the Hamilton Company before the dissolution of the plaintiff's assignor, there was, as against the Kidder Company, at least one breach of contract which occurred before the assignment ; and the damages for that

breach were clearly assignable. How far the Hamilton Company was affected by that breach we shall discuss hereafter.

With respect to the assignability of the entire contract we think the defendants' contention untenable. The contract itself neither expressly permits nor forbids the assignment, and the general rule is that a contract is assignable. If this contract was in its nature assignable, we think it was covered by the language used by the plaintiff's assignor in transferring its property ; so that all that is left is the question, whether the contract is in its nature assignable. It is argued that as it vests the title to the presses in the contractee and authorizes it to lease the same and to collect payments, thereby involving the relation of personal trust, credit and confidence, coupled with liabilities, the contract is non-assignable.

In Clarke on Contracts, 530, we find the rule stated as follows : "It may be said generally that anything that directly or indirectly involves a right of property is assignable, with the exception that rights and liabilities under an executory contract for personal services, or contracts involving personal credit, trust or confidence, cannot be assigned." In Pollock on Contracts (4th ed. 425) it is said : "Rights arising out of a contract cannot be transferred if they are coupled with liabilities or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided." And Wharton on Contracts (§ 848, p. 220) says : "When the assignee of an executory contract can perform the duty imposed by it as effectively as could the assignor, the fact that this duty is personal cannot be set up by the defendant in a suit by the assignee on the contract." We think, however, that it is doubtful whether the element of personal trust is involved in dealing with an ordinary business corporation, for the reason that such corporation has no personality to receive the trust ; its board and even its managing officers are liable to shift at any moment. In *New England Iron Company* v. *Gilbert El. R. R. Co.* (91 N. Y. 167) it is said : "The matter of the contract involved no personal relation or confidence between the parties, or exercise of personal skill or science, for the contractor was a corporation and its work was necessarily to be done through agents or servants." And in *Devlin* v. *The Mayor* (63 N. Y. 17) it was said : "Parties may, in

terms, prohibit the assignment of any contract and declare that neither personal representatives nor assignees shall succeed to any rights in virtue of it, or be bound by its obligations. But when this has not been declared expressly or by implication, contracts other than such as are personal in their character, as promises to marry or engagements for personal services requiring skill, science or peculiar qualifications, may be assigned, and by them the personal representatives will be bound. * * * When the contract is executory in its nature, and an assignee or personal representative can fairly and sufficiently execute all that the original contractor could have done, the assignee or representative may do so and have the benefit of the contract."

Passing these considerations, however, we think that the decision of the trial court should not be interfered with. By the contract the plaintiff's assignor obtained the exclusive right to the use of the Kidder Company's presses for the purpose of strip ticket printing, and the method of protecting that right was defined. In brief, the Kidder Company agreed to put all its presses under the control of the bank note company. The latter was to dispose of them by making to purchasers leases in perpetuity, containing clauses forbidding the use of the presses for strip ticket printing. It was explicitly provided that the bank note company should retain the title to the presses, evidently in order to enable it the more effectually to enforce the performance of the covenants. These leases were to be made "for such money as the Kidder Press Company shall nominate;" and the bank note company covenanted to "deliver to the Kidder Press Company the full consideration" thus fixed by the latter. It is clear, from a reading of these various provisions, that the bank note company was not the sales agent of the Kidder Company, in the ordinary sense. It did not choose customers or fix terms. All this was done by the Kidder Company; and the bank note company had not the slightest interest in these matters. The whole arrangement was made with the sole view of enabling the bank note company to protect its own contract rights. As the contract itself states, the system was adopted as "the most feasible and proper way to protect the interests of the Bank Note Company in and to the proper control and ownership hereby acquired in the Kidder Perfecting Press." The bank note company did but act

as the Kidder Company's right hand in carrying out the latter's agreements, exercising no discretion whatever. It is difficult to discern any element of a personal or confidential nature which would make the contract non-assignable.

We are, however, unable to agree with the learned counsel for the plaintiff that the moneys received from lessees of the presses did not pass through the hands of the bank note company. A provision already quoted distinctly specifies that the bank note company shall " deliver " to the Kidder Company the consideration received. It is true that in a former clause it is stated that the Kidder Company shall sell and " collect the money for " as many presses as it chooses, so long as the bank note company's rights are protected. But it is plain from the context that the money was to be collected, not directly from the vendees, but through the medium of the bank note company. A general right to sell was conferred, but it was to be exercised in conformity with the arrangement so carefully defined. The bank note company was thus under a liability to account to the Kidder Company for all moneys received from lessees. We agree that, in general, rights arising out of contract cannot be transferred if they are coupled with liabilities. (*Arkansas Smelting Co.* v. *Belden Mining Co.*, 127 U. S. 379; Pollock Cont. *supra.*) We do not think, however, that the general rule applies to the facts of this particular case. The defendants contend that, as the assignor placed itself under a liability to the Kidder Company, the latter had the right to insist upon the responsibility of the company with which it had contracted, and to decline to receive in its stead that of another company with which it had not contracted. The answer to this is that there was, in truth, no such substantial substitution of parties. Technically, the contract was assigned; but practically, it was not. The assignment was part of the reorganization, and but a means to that end. With it were assigned all the property and choses in action of the original company, with the exception of one designated claim. The stock of the new company was distributed ratably among the stockholders of the old. Technically, the new company was a distinct legal entity from the old; but to all intents and purposes it was the same concern. It is strenuously urged that the management changed. In fact, this is not so. It appears that when the contract was made in

October, 1891, some men of financial standing were officers of the company who never had any interest in the new company. But these men left the company before the reorganization, and whatever advantage accrued to the press company from their presence in the old bank note company had been lost in any event. The risk of such changes is assumed by every one who contracts with a corporation. The new company had the same assets as the old, the same business and, so far as appears, the same charter rights. To hold that it was an " assignee " of the contract, within the meaning of the rule relied upon, is to regard form and disregard substance. In the absence of special circumstances there should, we think, be no hesitation in holding that the reorganization of a corporation does not prevent the new company from succeeding to all the rights and liabilities arising under contracts of the old.

But even if the plaintiff were not entitled to rely upon such a rule of law, the decision of the trial court that the contract was assignable ought not to be disturbed. The question of assignability is one of intent, to be deduced from all the circumstances, and may be controlled by express words in the instrument. So, also, general rules on the subject may be controlled by special facts. If the terms and subject-matter of the agreement leave any doubt upon the point, no reason is apparent why the difficulty should not be solved, as in any other case, by a resort to extrinsic proof. We think that the most the defendants can justly claim here is that such an ambiguity existed upon the face of the contract. To prove the real intention the plaintiff showed that the assignor corporation had, in September, 1890, passed a resolution authorizing a reorganization under the laws of West Virginia, and that Mr. Kidder, the treasurer of the press company, knew of this resolution before, and at the time of the signing of the contract, and assented to a transfer of the contract to the new company. Mr. Kidder might not have been able to bind his company by an agreement of this nature, but his knowledge of this fact was the knowledge of the company, for he was very prominent in the negotiations with the plaintiff and its predecessor, and was the officer who signed the contract sued upon in behalf of the press company. The press company thus knew of the contemplated transfer of the contract before and after it was made, yet it took no step indicating its disapproval, so far as can be

seen, until the present action was brought. The point now made is evidently one raised by the ingenuity of counsel. This recognition of the plaintiff's status is a relevant consideration (*Devlin* v. *The Mayor*, 63 N. Y. 8, 14), and upon all the facts the decision of the trial judge, that it was intended that the contract might be assigned, is not to be disturbed.

The only remaining question which we think it necessary to discuss is the question of damages, and before stating what we think the correct rule to be, it will be necessary to dispose of an incidental question upon which the extent of damages to be allowed must be fixed.

If the learned trial judge was right in his view that when the Hamilton Company purchased the first press they knew that there was a subsisting contract between the New York Company and the Kidder Company, but did not know its terms and conditions, and for that reason are not chargeable with any damages for tickets printed on that machine until the date when they became acquainted with such terms and conditions, then it is doubtful whether any damages would flow from the use of that machine, or as to whether its use could be enjoined. If that company, without notice, had purchased the machine, it would thereby have acquired an unrestricted right to its use, and it would be exceedingly difficult to formulate a principle upon which it would be liable for damages by reason of knowledge which it subsequently acquired that the machine which it had purchased without restrictions was subject to a contract which prevented its sale for unrestricted use. We agree with the construction given to the contract between the Kidder Company and the plaintiff's assignor, that it covered the sale of the Kidder perfecting press, with or without attachments for printing strip tickets, and if the Hamilton Company purchased a perfecting press, without such attachments, with knowledge of the restriction existing as the result of the contract between the other companies, then it was liable for the damages which it inflicted upon the plaintiff in the use of such press for printing strip tickets. We are, therefore, brought to a consideration of the correctness of the finding of the learned trial judge upon the subject of notice by the Hamilton Company at the date of the purchase of the first press. He has found that the Hamilton Company knew of the existence of the

contract, and it is not disputed that Gray, who signed the original contract on the plaintiff's behalf, was at the time of the purchase of the first machine the vice-president of the Hamilton Company, and knew all the terms and conditions of the contract; and although his exact duties at the time of the purchase are placed in doubt by the testimony directed to showing that he was not the manager of the Hamilton Company at that time, it appears beyond dispute that he was really the agent who procured the purchase of the first press. Thus, in his letter of December 14, 1892, to Mr. Kidder, Gray says: "Mr. Seebeck (president of the Hamilton Company) proposes at my suggestion to come on to-morrow and arrange details of the machine with you Friday. He knows nothing of my conversation with you last night, but the bare fact that you offered to sell or build us one of the double perfecting presses." It, therefore, appears that Gray, who knew all about the plaintiff's contract, was the procuring agent of the Hamilton Company in the purchase. We have also the evidence of Mr. Kendall that he read to Seebeck, prior to the purchase, all the material portions of the plaintiff's contract; and Seebeck's denial of this must be taken in connection with his letter of November 28, 1892, in which he asks whether the Kidder Company's obligations cover any and all presses or only the perfecting press.

Pomeroy, in his work on Equity Jurisprudence (§ 597), says: "A purchaser or person obtaining any right in specific property is not affected by vague rumors. * * * On the other hand, the proposition is established by an absolute unanimity of authority, and is equally true, both in its application to constructive notice and to actual notice not proved by direct evidence, but inferred from circumstances, that if the party obtains knowledge or information of facts tending to show the existence of a prior right in conflict with the interest which he is seeking to obtain, and which are sufficient to put a reasonably prudent man upon inquiry, then it may be a legitimate, and perhaps even necessary, inference that he acquired the further information which constitutes actual notice. * * * If, however, it appears that the party obtains knowledge or information of such facts, which are sufficient to put a prudent man upon inquiry, and which are of such a nature that the inquiry, *if prosecuted*

*with reasonable diligence, would certainly lead to a discovery of the conflicting claim,* then the inference that he acquired the information constituting actual notice is necessary and absolute; for this is only another mode of stating that the party was put upon inquiry; that he made the inquiry and arrived at the truth. Finally, if it appears that the party has knowledge or information of such facts sufficient to put a prudent man upon inquiry, and that he wholly neglects to make any inquiry, or having begun it fails to prosecute it in a reasonable manner, then, also, the inference of actual notice is necessary and absolute." (See, also, *Williamson* v. *Brown*, 15 N. Y. 354; *Kirsch* v. *Tozier*, 143 id. 390; *Baker* v. *Bliss*, 39 id. 70; *Edwards* v. *Dooley*, 120 id. 553.)

The evidence as to the knowledge of Seebeck, the president of the Hamilton Company, as shown by his letters, seems to us to be conclusive upon the question that if he did not have in mind when the press was first purchased the exact terms of the plaintiff's contract, he had sufficient information to put him upon inquiry; and he was bound, in order to put the Hamilton Company in the position of an innocent purchaser, to prosecute his inquiries or ask for the contract. He undoubtedly knew that Gray had formerly been an officer of the plaintiff company, and he could have obtained all the information necessary by asking him. We think, therefore, that the finding, as well as the decree, limiting the damages with reference to the first machine from the time of the repairing or rebuilding of the attachments by the Kidder Company, should be modified so as to permit the plaintiff's damages to run from December 29, 1892, the date when the first machine was delivered, instead of from about August, 1893, as provided in the decree.

We think also that the learned trial judge was in error in stating the rule of damages to be the actual profit which has been made by the Hamilton Company by the printing by it of strip tickets upon both presses purchased of the Kidder Company. In this connection it must be remembered that the Kidder press with the attachments was not secured by patents to which the plaintiff's assignor became entitled by virtue of its contract; but there were other means open of printing strip tickets, which, however, required two operations to print on both sides. Thus, it was shown that there was a press in the possession of the Hamilton Company for many

years prior to 1891, which, though it did not print on both sides at once, did print in two colors on one side, and consecutively number and perforate strip tickets, and that strip tickets were printed on it long prior to the making of the contract which lies at the basis of this action. Such tickets had to be backed by running them through the press another time. These two operations necessarily took more time and involved a greater expense than the one. The value of the Kidder perfecting press with attachments was in the rapidity, facility and economy with which the tickets could be printed, thus enabling one who had a perfecting press to supply at a low rate the daily demand for large quantities of strip tickets which could not be accomplished without such a press. Notwithstanding, however, the advantages of the Kidder press, it was necessary, in order for the plaintiff to secure as a measure of damages the whole profit derived by the Hamilton Company from printing strip tickets, to show that the Kidder perfecting press was the subject of a monoply by virtue of valid outstanding patents or was the only available machinery for printing strip tickets. This it did not do. The evidence is susceptible of the inference that what these presses accomplished was a saving over any other method of printing strip tickets. In such a case, even in a patent suit, the damages would be confined to the exact saving thus effected. In Walker on Patents (3d ed. § 725, p. 553) the rule is thus stated : " The advantage which the defendant derived from using the complainant's invention over what he could have derived from using any other process or thing which was known prior to that invention, constitutes the profits which the complainant is entitled to recover." What the defendants here are liable for are the natural and obvious consequences of the breach of the contract ; and such consequences in the shape of damages could only be the gains by printing on the presses in question, instead of on any other press purchasable elsewhere or capable of being manufactured by others than the Kidder Company.

Our conclusion, therefore, is that the interlocutory judgment and decree should be modified with respect to the date from which the accounting as to the first machine should begin, and that upon such accounting the measure of damages to be applied should be as herein

stated; and as so modified the judgment should be affirmed, without costs.

PATTERSON and RUMSEY, JJ., dissented.

BARRETT, J. (concurring):

I fully concur in the opinion of Mr. Justice O'BRIEN. I think the rule of damages therein laid down is the true one, and that it will be found applicable to any state of facts which may appear before the referee who ascertains them. The trial judge has found that the Hamilton Company obtained certain valuable contracts which it could not have obtained except by means of the Kidder perfecting press. It would seem that, in such cases, the defendants should account for the whole of the profits realized, but that would be so under the rule which we have laid down. If a contract could not have been obtained by any other means, then all profits made under it are profits in excess of what could have been made by the use of any other machine, and should be accounted for in full. It was relevant for the trial court to consider the peculiar value of the monopoly right in deciding whether an injunction should issue, and the fact that valuable contracts were obtained solely through its violation was strong evidence on the point. The whole question of damages, therefore, will be open to the referee, who will consider all the facts and apply thereto the rule which we have laid down. And that rule may entitle the plaintiff to the entire profits realized upon any contract dependent upon its special circumstances.

I think, also, that a third answer might well be made to the contention that the contract cannot be enforced by the plaintiff. The Kidder Company should not be allowed to repudiate the contract on this or any other ground without restoring what it has received under it. The contract distinctly shows that $1,500 was paid for the monopoly agreement by which it now refuses to abide. If the plaintiff did not acquire the right to enforce this agreement, it at least succeeded, along with all the other assets of the New Jersey corporation, to the right to have the money due under or by reason of that agreement refunded. The Kidder Company has not paid or tendered this money. As the New Jersey corporation is practically, if not technically, dissolved, the Kidder Company, if not liable to the plaintiff, seems to have escaped all the burdens of the agree-

ment while retaining the benefits. It should not be allowed to maintain its present position.

Van Brunt, P. J., and O'Brien, J., concurred.

Patterson, J. (dissenting):

I do not agree with a majority of the court concerning the question of the assignability of the contract upon which this suit was brought. I think the true construction of that contract indicates that the relation established between the Kidder Press Company and the New Jersey corporation, with reference to perfecting presses thereafter to be manufactured and sold by the Kidder Company, was that of principal and agent, and hence that such relation was fiduciary and confidential. If that construction is correct, there can be no question that the contract was not assignable. (*Rochester Lantern Co.* v. *The Stiles & Parker Press Co.*, 135 N. Y. 209; *Arkansas Smelting Co.* v. *Belden Mining Co.*, 127 U. S. 379.) It is conceded that unless such confidential relation is established, in this State at least, the contract is assignable. (*Devlin* v. *The Mayor*, 63 N. Y. 8.)

Entering upon a dissection of the provisions of the contract in suit, we find that all of its terms were arranged with reference to the sale of one specific press bought by the New Jersey corporation, which press was to be used for the purpose of printing strip tickets. At the same time it was the avowed purpose of the contracting parties to give to the New Jersey corporation the exclusive control of all perfecting presses to be manufactured by the Kidder Company in the future, so far as to prevent their use by third parties for the printing of strip tickets; or, in other words, that for the one particular purpose a monopoly of use was to be secured to the New Jersey corporation. Nevertheless, it was within the intention of the parties to the contract, and they so stipulated, that nothing in its terms was to limit the sale by the Kidder Company of perfecting presses, such as that purchased by the New Jersey corporation, for any purpose, except the printing of strip tickets as they were printed on the machine bought by the New Jersey corporation. As the contract expressly states, it is the pleasure of the bank note company (that is, the New Jersey company), as well as, pre-

sumably, the profit of the Kidder Company, that it shall make, sell, *deliver* and collect the money for as many presses similar to the one ordered from the press company, and shall enjoy all the emoluments of the utmost possible extension of the press company's business by reason of the sale of printing presses identical with those referred to in that contract. Therefore, by the express stipulation of the parties, there was to be no limitation of any kind upon the Kidder Press Company's selling all of its presses except that which is subsequently provided for in the agreement. It then became a matter of consideration between the parties how this liberty of sale was to be preserved to the Kidder Company, and at the same time the monopoly of use for printing strip tickets be secured to the New Jersey corporation; and thereupon they devised a scheme which was declared to be the form in which transactions of sales by the Kidder Company to third parties should be made. By reason of the adoption of that form of doing business the New Jersey corporation put itself not only in the technical but in the actual attitude of an agent for sales for the Kidder Company. It was agreed and assented to by both parties that the most feasible and proper way to protect the interests of the bank note company, in and to the proper control and ownership acquired in the Kidder perfecting press, was that then adopted.

It will be observed that, notwithstanding the form of expression, the New Jersey corporation was not, according to this contract, to acquire the real ownership of the machines, but only the right to control their use. That is what is meant by "ownership," referred to in the provision of the agreement now under consideration. The proper way referred to, according to the terms of the contract, "is that whatever sales of this press or presses are made by the Kidder Press Company" under the absolute authority which it has received to sell to any one it pleases, "shall be made to the New York Bank Note Company for the account of the party desiring to use the press or presses." That is to say, the title nominally shall be put in the New York Bank Note Company. That company is then to execute a perpetual lease to the purchaser "for such money as the Kidder Press Company shall nominate; but the New York Bank Note Company shall in nowise part with the title in and to the machine delivered, but shall retain its actual ownership of the

press or presses under agreements permitting its use for all purposes except strip tickets."

Now, what does that mean? There is no absolute ownership of the press or presses intended, but the New York Bank Note Company is to take a nominal title for the benefit of the Kidder Press Company and to execute leases. That is to say, all the sales made by the Kidder Company to third persons are to pass under the form of leases made by the New York Bank Note Company. For whom? Certainly not for the benefit of the bank note company, with reference to its obtaining rents or royalties for the use. They do not stipulate to pay one dollar for any machine, nor to acquire any interest for themselves except the right so to control sales as to prevent the use of the machines for strip tickets. The agreement then goes on to say that this form of agreement "it is agreed by the Kidder Press Company, shall be used in whatever sales are made of its Perfecting Presses." Not one of them is sold to the New York Company. "And the New York Bank Note Company shall deliver to the Kidder Press Company the *full consideration* it (the Press Company) *may nominate*, and the Bank Note Company shall have its own agreements with the purchaser in accordance with the above plan * * * ."

The whole scheme of this agreement, with reference to the parts that have been last adverted to, is that respecting sales made to third parties by the Kidder Press Company of perfecting presses, those sales shall pass through the New York Company as nominal owner, with the right to that company to make terms and conditions of a lease, and the only interest which the New York Bank Note Company can by any possibility have is the curtailment of use of the machines. And yet, at the same time, the New York Company binds itself to make these leases, to take a nominal ownership, and to return the consideration — that is to say, whatever consideration it may receive — to the Kidder Press Company. It cannot be said that this is a mere idle form and that the New York Bank Note Company would not receive any consideration or any moneys. That it was contemplated that it should do so is apparent from the fact that there is a specific obligation assumed to deliver to the Kidder Press Company "the full consideration" the Kidder Company "may nominate" for that press. It seems to me to be perfectly

clear that this is a contract of agency, intended by the parties to be such, that is to say, in form such, and in substance such, and that, therefore, the contract was not assignable, because it involved the duties of agency.

Nor can it be said that the effect of this construction is to be escaped because in the year 1889, in some of the preliminary negotiations connected with the making of the contract, and a year and more before the contract was signed, Mr. Kendall, the president of the New York Bank Note Company, stated to Mr. Kidder that the New Jersey corporation would, in all likelihood, be dissolved, and that the business of the company would be reorganized and carried on by a company to be incorporated in West Virginia. No such term is included in the contract. All matters that were in contemplation between the parties, as part of the arrangement, were merged in the contract. Notice to Mr. Kidder of an intention to reorganize the company or to discontinue the New Jersey business, is not notice to the company, because it is perfectly apparent, upon the testimony of Mr. Kendall himself, that Mr. Kidder had no authority to bind the Kidder Press Company by any agreement or understanding to the effect that a devolution of the business of the New Jersey corporation upon another corporation would be recognized. Mr. Kendall, the president of the New Jersey corporation, knew that Mr. Kidder had no right to assent to any such arrangement. He also knew that Mr. Kidder had no right to make the contract of October twelfth, as an individual, or as an officer of the company, without the action of the corporation itself. He swears that he would not accept the contract of October twelfth, by delivery from Mr. Kidder alone. He insisted upon that contract being adopted and ratified by the board of directors of the Kidder Press Company at a formal meeting, before he would accept it or act under it, or regard his company or the Kidder Company as bound by it; and even when there was presented to him a paper signed by every director of the Kidder Company assenting to the contract of October twelfth, he still insisted that there was no enforcible contract made between the parties, and thereupon a meeting was called and held of the Kidder Company directors in Boston in December, 1889, when by formal resolution the contract was adopted and ratified and made binding upon the Kidder Company; and not until then did

Mr. Kendall, as president of the New York Bank Note Company, regard the Kidder Company as bound.   Therefore, there is nothing in the question of notification.  The notice amounted to nothing at all, and the parties must stand upon the terms of the contract as they are, without importing into them any suggestion that was made in a casual conversation during the negotiations for the making of that contract.

I think that under the true construction of this contract, it was non-assignable, because it established the relation referred to, and that there was nothing which binds or estops in any way the Kidder Company from insisting upon their defense that the contract was non-assignable.

RUMSEY, J., concurred.

Judgment modified as directed in opinion, and as modified affirmed, without costs.