THE NATIONAL CASH REGISTER COMPANY, Plaintiff, v. REMINGTON ARMS COMPANY, INC., Defendant.

Supreme Court, New York Special Term, January, 1924.

Contracts — action to compel assignment of patents — in a one-year employment contract, employee's covenant to assign to his employer any invention made " during such period of one year " after " the cessation of his employment and the severance of his connection " with his employer, held in the light of other clauses to refer to the year following actual cessation of employment, not to the year following initial one-year term of employment — when such covenant deemed to have been renewed by implication by continuance of active employment — when defense of laches will not defeat plaintiff's right to equitable relief.

Plaintiff employed F. as inventor at a $5,000 salary for one year from February 17, 1909. F. covenanted to transfer to plaintiff all cash register mechanisms made by him during his employment and if at the end of the contract he left plaintiff's employ, plaintiff being willing to retain him at the then existing salary, not to enter the service of any other cash register company for the year immediately following the severance of his connection with plaintiff and to assign to plaintiff any invention in cash registers which he made during such period of one year.

F. continued in plaintiff's employ until 1917 after March, 1910, under an oral hiring from month to month, nothing being said about any of the protective clauses of the original contract.

In September, 1917, while on his usual summer vacation, he wrote plaintiff resigning retroactively as of September first. Within a year he perfected the invention of a new cash register for defendant, which had full knowledge of F.'s contract and relations with plaintiff.

In an action to compel defendant to assign all patents and patent applications relating to said invention, held:

That, in the light of what the parties sought to accomplish, the covenant to assign to plaintiff any invention made " during such period of one year following such termination of employment " refers to the year following actual cessation of employment, not to the year following the initial one-year term of employment;

That such covenant was renewed by implication by F.'s continuance of active employment so as to remain effective for one year from September, 1917;

That plaintiff when F. left its employ was willing to retain him at a salary equal to that he was then receiving.

Laches is no defense since plaintiff had no knowledge of F.'s breach or of the appropriation by defendant of any invention made by F. within the one-year period.

ACTION for breach of contract.

*Sullivan & Cromwell* (*Harlan F. Stone, Edward H. Green, DeLano Andrews* and *Melville Church*, of counsel), for plaintiff.

*Shearman & Sterling* (*John A. Garver, Drury W. Cooper, George Ramsey* and *Chauncey B. Garver*, of counsel), for defendant.

PROSKAUER, J. On February 17, 1909, Frederick L. Fuller, an able and experienced inventor, made a contract (Exhibit A of the

complaint) with the plaintiff (hereinafter called the " National Company "), whereby he was employed " in the capacity of inventor for a period of one year commencing the 15th day of March, 1909," at a salary of $5,000.  His reciprocal covenant was not to serve for the year, but to enter the employment and to give his entire time " while this contract is in effect " to inventing and experimental work.  The contract recited that since he will be " entrusted by said Company with information regarding many of its mechanical devices, the demands of the future looking to the possible betterment of all of their contrivances and mechanisms incidental to their business, and other confidential information relating to inventions and the development of the cash register business, said Fuller therefore agrees " to transfer to the company on a form annexed all cash register mechanisms which he might " make or conceive " during his employment.  In view of the previous recital " as to the position of trust to be held by said Fuller and the acquisition by him of vital and confidential information regarding the company's mechanical devices, the trend of development, and the demands of the future, and since if would be manifestly unfair to take advantage of this information to the detriment of the National Company after the termination of his active employment by said Company, said Fuller hereby agrees that if at the end of this contract he does not wish to longer continue in the employ of said National Company and leaves said National Company, and said National Company being still willing to employ said Fuller at a salary equal to that he is then receiving, then, in this event he will not for a period of one year immediately following the cessation of his employment and the severance of his connection with the National Company enter the services of any other cash register company, as inventor * * * and *he also agrees to assign and transfer to said National Company any invention in cash registers * * * which he may make during such period of one year following such termination of employment."*  He remained in the employ of the National Company until, in September, 1917, he entered the employ of defendant (hereinafter called the " Remington Company "), which had full knowledge of the 1909 contract.  Within one year he perfected for the defendant the invention of a new cash register.  Plaintiff claims that the quoted clause requiring assignment of inventions relates to the year following actual cessation of employment. Defendant claims that it relates to the year following the initial one-year term of employment only, but concedes that if plaintiff's interpretation is correct, this invention and the patent applications and patents incident thereto should be awarded to plaintiff by the judgment sought here.

**236** NATIONAL CASH REGISTER CO. *v.* REMINGTON ARMS CO., INC.

Supreme Court, January, 1924. [Vol. 122

Such protective covenants are sustained for the reason stated by Judge Simonton in *Hulse* v. *Bonsack Mach. Co.*, 65 Fed. Rep. 864, 867: " The improvement would be his own idea. But it owed its suggestion and origin, its progressive development and perfection, to the business, the practical working, the opportunity afforded by the company. When, therefore, the company, taught by costly experience, determined to protect itself from the discovery of improvements by its own servants, it did a natural and reasonable thing."

This plaintiff did exactly what is thus described. The two recitals of Exhibit A, heretofore quoted, practically paraphrase this opinion. Plaintiff bound itself to keep Fuller only a year. But in hiring him as an inventor and giving him insight into the secrets of its business, it clearly contemplated and provided for the possibility of a longer relationship. It aimed to secure whatever Fuller's ingenuity created within one year, not merely from the initial term, but from the " cessation of his employment and the severance of his connection with the company." The longer he served, the more knowledge he had of the processes employed and the more reason there was to achieve this aim.

The whole instrument must be considered to determine " what the parties intended to do or sought to accomplish." *Fleischmann* v. *Furgueson*, 223 N. Y. 235, 239. They intended that Fuller should surrender whatever cash register inventions he made within a year after he actually ended the confidential relationship which prompted the covenant. They sought to accomplish that plaintiff and not some competitor should have the fruits of what Fuller might conceive while in plaintiff's employ but execute shortly thereafter. The purpose of the contract is effectuated only by a construction which holds him subject to its terms for one year after he in fact left.

Many expressions in the contract fortify this conclusion drawn from its general tenor. Fuller covenanted to devote himself to the company " while this contract is in effect; " to be in a confidential position " *while in the employ* " of said National Company and to transfer to plaintiff inventions which he may make " during *the term of his employment by said company.*" These phrases indicate that a relationship not necessarily coincident with the assured initial year was contemplated. The recital is that it would be unfair for Fuller to take advantage of confidential information " *after the termination of his active employment,*" not after the expiration of the one-year term. Reference is made to Fuller's leaving, " the said National Company being still willing to employ said Fuller at a salary equal to that he is then receiving." For the first year he was to receive $5,000. This language would be pointless

circumlocution if defendant's interpretation is correct. Otherwise it is perfectly appropriate, because no one could foresee what salary he might be receiving subsequent to the initial year. Fuller's obligation is to continue for one year " immediately following the cessation of his employment and the severance of his connection with the company." Here, by unequivocal language, Fuller is bound for one year after the final termination of his service, whenever that occurred. Other phrases are of like effect. Nor is defendant's contention sound that under this construction Fuller might have been compelled to resign by drastic reduction of his salary and still be held subject to the restrictive covenants. For these covenants are effective only if plaintiff was willing to continue Fuller's employment at the salary " he is then receiving." He could leave, free of restrictions, upon any salary reduction. By reason both of its general purport and of its specific language, this contract means that in consideration of the assurance to him of one year's employment at $5,000, Fuller covenanted that whenever he voluntarily left the plaintiff's service he would assign to plaintiff his cash register inventions made within one year after such actual termination of the employment.

Authorities cited as criteria for interpretation of this contract, too numerous to be discussed within the limits of this opinion, have aided in the discharge of the fundamental task of ascertaining and effectuating the actual intent of the parties.

Moreover, the contract remained effective for one year from September, 1917, not only *ex proprio vigore*, but also by renewal implied from acts of the parties.

At the end of the first year Fuller and his immediate superior, Muzzy, discussed future relations. Plaintiff contends that this conversation continued the essential terms of the contract and defendant claims that it abrogated them. Muzzy testified that Fuller asked for a definite term contract and was told that the company would not give it and that Fuller stayed on as an employee at will. Fuller's testimony is in substantial accord, except for the immaterial difference that he says he was to continue to work " by the month " and except that he inserts into his narrative of the conversation the words " in that case I am free to go where I please." The use of these words is denied by Muzzy. Primarily Fuller and Muzzy were intent on continuing the employment. The use of the disputed phrase is as improbable as would be Fuller's recollection of it after thirteen years. Nor can I attach to its haphazard interjection the importance claimed for it by defendant that it effected an express cancellation of the protective clauses of Exhibit A.

**238**  NATIONAL CASH REGISTER CO. *v.* REMINGTON ARMS CO., INC.

Supreme Court, January, 1924.                [Vol. 122

One circumstance has weight more plausible than real in defendant's favor. Two months after the expiration of his first year Fuller executed in the form annexed to the 1909 contract an assignment (Exhibit B of the complaint) of all cash register inventions made or to be made while in the employ of plaintiff. This would corroborate testimony that a new agreement canceling the old was made. On the trial, therefore, counsel were explicitly requested to present all evidence upon this subject. None has been produced tending to show that the execution of Exhibit B was part of a plan to supersede Exhibit A. It was merely a confirmatory assignment in the form provided by Exhibit A itself. Plaintiff's express agreement with Fuller in March, 1910, that he was to continue in its employ from month to month, implied continuance of all appropriate and consistent terms of the existing agreement. If Fuller had merely held over, nothing being said, his contract would have been deemed renewed from year to year. *Adams* v. *Fitzpatrick*, 125 N. Y. 124, 128.

In Williston on Contracts (§ 90, p. 155) it is stated: " Where a contract of employment for a definite time is made and the employee's services are continued after the expiration of the time, without objection, the inference is that the parties have assented to another contract for a term of the same length with the same salary and conditions of service; following the analogy of a similar rule in regard to leases."

If such continuance implies that all provisions of the contract remained in force, agreement to continue with express change of only the provision as to term preserves the other provisions. Some provisions must of necessity have been imported into the new arrangement. Obviously Fuller was still to be an inventor, not a menial; he was to give to his employer his inventions; he was certainly not to betray its confidence. With equal appropriateness he was to respect the restrictive covenants explicitly recited to be so essential to the relationship.

In *Stern* v. *Avedon & Co., Inc.*, 194 App. Div. 433, 435; affd., 231 N. Y. 546, a tenant held over, but with a new agreement as to rental. The question was whether " the tenant held under a lease implied by law for the term of one year at an increased rental, but otherwise subject to the covenants and conditions of the original leases." Justice Page writes: " It is to be noted that in the conversation between the landlord and the tenant herein nothing was said as to the term, nor as to the payment of the rent, whether monthly, quarterly, semi-annually in advance or at the end of the term whatever that might be. The original leases were carefully drawn and contained numerous covenants and agreements." He then

enumerates such covenants as to pay the rent monthly, to comply with regulations of governmental departments, not to assign, and continues: " Not a word was said as to any of these covenants and agreements. The landlord still holds the security deposited with him. It is not to be assumed that either party intended to forego and relinquish the benefit and protection of these covenants and agreements, but rather that they were silent as to them for the reason that if the tenant held over after the expiration of his term and the landlord elected to accept him as a tenant the law would imply a term for a year subject to all the covenants and agreements of the former lease except as changed by the increase in rent." *Watters* v. *Plumbers' Trade Journal Pub. Co.*, 86 Misc. Rep. 38; *Clarke* v. *Howland*, 85 N. Y. 204; *Canton Steel Ceiling Co.* v. *Duffy Malt Whiskey Co.*, 200 App. Div. 306; *Styles* v. *Lyon*, 87 Conn. 23; *Dutton* v. *Gale Mfg. Co.*, 43 Hun, 198.

Similarly Muzzy and Fuller said only that Fuller was to continue from month to month. Unless they understood that this continuance was otherwise under the provisions of his initial employment, their conversation was meaningless. And in actual practice, whenever question arose as to the obligation of Fuller, it was the 1909 contract that was examined. Fuller handed it to the defendant when he was negotiating to enter its employ. Glass, patent attorney for defendant, and Beust, plaintiff's attorney, examined it to determine the duty owed by Fuller to plaintiff after he was in Remington's employ. In July, 1918, plaintiff wrote to Fuller inquiring whether his employment with the defendant (then not yet openly in the cash register business) was not in violation of the contract which the company " has with you under date of February 17, 1909." Fuller, after consulting defendant's counsel, claimed not that the 1909 contract was inapplicable, but only that his conduct " violates and has violated no agreement between the National Company and me." These acts do not indicate belief that the contract was ended in 1910. Defendant having employed Fuller, under circumstances hereafter discussed, knowing of the 1909 agreement and of his continuance with plaintiff, was chargeable with knowledge of the terms of his continued employment, which reasonable inquiry must have readily disclosed.

Defendant contends that plaintiff has not shown compliance with the condition, " said National Company being still willing to employ said Fuller at a salary equal to that he is then receiving." The proof on this subject is necessarily meagre. The question is one of fact. There is no dispute in the evidence. In August, 1917, Fuller secretly began negotiation with the Remington Company, then contemplating entering into the cash register business.

He consummated his contract of employment with it before he left for his vacation about September first. He discussed with his superior the length of his vacation and the advantage to the plaintiff of giving him the desired time off. He concealed his contract with the Remington Company and gave no intimation of intention to resign. Some two weeks thereafter he wrote resigning retroactively as of September first. On the day as of which he resigned he was on vacation with pay without the slightest suggestion of any change in the relationship. In fact when he left plaintiff's employ, it was willing to retain him at a salary equal to that he was then receiving.

Except for a defense of laches, hereafter to be considered, what has been said determines this controversy. The importance of the cause and the great amount of argument and testimony concerning claims asserted by plaintiff to two separate features of defendant's machine require brief consideration of these claims.

In the patent application No. 263,125 (and the corresponding British patent) representing defendant's machine, there is used in connection with the adding mechanism a differential cam. This is a plate with a slot in which works a pin that thus causes the cam to carry on to a subsequent member motion imparted to it from a prior member that actuates the pin. The beginning and end of this cam slot are concentric with the arc on which the pin moves. At these points the pin moves, therefore, without pressure against the sides of the slot and thus imparts no motion. This device is called a dwell. While in plaintiff's employ Fuller made four drawings (Exhibits 13 to 16 inclusive), which show an initial and final dwell. Plaintiff claims the idea as an invention made by Fuller while in its employ. The dwell, however, was an ordinary well-known device for keeping a portion of the mechanism in rest while another portion performed a given function. Use of both an initial and a final dwell was also made in an invention made by Fuller in conjunction with one Robertson and already assigned to plaintiff. Fuller-Robertson application No. 394,974. They were not an invention or improvement, patentable or unpatentable. They were no more significant than would have been indication by the draftsman of two bolts or two nails.

Plaintiff's second claim is that a so-called paper feed and shift mechanism embraced in the Remington patent application No. 263,125 is an improvement which "*depends for utility*" upon a mechanism disclosed in the National application No. 299,112, invented by Fuller, and, therefore, plaintiff's property by virtue of a clause in Exhibit B giving it any invention of Fuller's which

" depends for utility " on any invention made by him while in its employ. On the face of a cash register is a glass plate under which runs a strip of paper. A slot, cut in the glass, enables the salesman to write on the paper the character of the merchandise sold or similar information. By pressure, sometimes of a key, sometimes of a lever, the paper is then carried forward into contact with a device that prints the amount of the purchase. This movement is called the shift. The printed portion must then be carried back away from the printing device and to a point beyond the slot in order to bring the next portion of paper under the slot for recording the next transaction. The paper must be absorbed upon a storage roll sufficiently to accomplish this. This process is called the feed. So much as has been described was old in the art long prior to 1915. Fuller used in his Remington machine a swinging frame that operated both shift and feed; in his earlier National machine he used a complicated construction of a wheel with a flange on the edge and a friction clutch to actuate the feed process. In the Remington device there is a single loop of paper extending over the printing frame. One end is carried over a stationary roll and the other over a movable roll. The whole operation occurs in this machine on the downward stroke of the key and the feed is accomplished by wrapping the paper on the storage roll which does not turn. In the National device the wheel and clutch turn the storage roll and wind the paper on it. This method is inapplicable to a machine of the Remington type operated without a lever merely by the pressure of a key. The devices are thus different in method and application. They have been carefully described in the opinion of Judge Morris of the United States District Court in *National Cash Register Co.* v. *Remington Arms, Inc.*, 293 Fed. Rep. 123. While that opinion deals primarily with patent questions, its discussion of evidence largely identical with that in this case confirms the conclusion that the Remington device depends for its utility upon a group of earlier devices not at all similar to those upon which the National Company relies. It is a link in the evolution of key-operated machines, in which the device relied on by the National Company is itself not at all a link. This finding in defendant's favor is made without reliance on its claim that the judgment in the patent suit is *res adjudicata* and that judgment is excluded.

There remains to consider defendant's claim that plaintiff has been guilty of laches which defeats its right to recovery. Judge Gray in *Treadwell* v. *Clark*, 190 N. Y. 51, 60, said: " We have held it to be a matter of serious doubt whether the equitable doctrine

of laches, as distinct from the Statute of Limitations, now exists in this State."

Plaintiff cannot lose a right by mere delay without any element of estoppel. The tests are clear. Was the defendant misled by plaintiff's acquiescence? *New York Bank Note Co.* v. *Hamilton Bank Note Co.*, 28 App. Div. 411, 419. Did the person sought to be estopped " do some act or make some admission with an intention of influencing the conduct of another, or that he had reason to believe would influence his conduct, and which act or admission is inconsistent with the claim he proposes now to make? " *New York Rubber Co.* v. *Rothery*, 107 N. Y. 310, 316. Has the defendant itself failed to do what a " reasonably prudent man would do in the exercise of an ordinary diligence? " *Rogers* v. *Adams*, 119 Misc. Rep. 77, 81; affd., 206 App. Div. 739.

This defendant was not misled because it had full knowledge of plaintiff's rights and position. It hired Fuller away from plaintiff. With him it hired three other former employees of plaintiff. They were to get $150,000 on condition that their cash register design should not infringe upon any patent. Defendant did not impose the condition that the new design should not violate the 1909 contract, of which it knew. In July, 1918, plaintiff wrote Fuller reminding him of the restrictions in his contract and continuing: " If I am wrong in my impression as to the character of your present employment, which I understand to be cash register development work, I know you will be good enough to advise me." Fuller immediately showed this letter to defendant's representative, who stated that it was " all right," and Fuller then replied that he was doing nothing to breach the contract. Here was unequivocal notice to defendant itself that plaintiff was asserting, not abandoning, its rights under the 1909 contract.

Likewise, plaintiff cannot be estopped because it was itself deceived and acted reasonably in the light of the information it had. When Fuller left for his vacation he gave no intimation of his new employment. He then wrote to plaintiff's president a letter of appreciation, with no word of intention to enter into competition. As late as March, 1918, he wrote letters to plaintiff's secretary referring to himself as being engaged in defendant's general business of gun construction. He was then actually working on defendant's cash register. His explanation of these letters as a joke is unconvincing. Thereafter plaintiff heard conflicting rumors as to whether the Remington Company was going into the cash register business and wrote the letter of July, 1918, to Fuller. Plaintiff's first knowledge of any assignment of patents by Fuller to defendant was in February, 1920, when one of its attorneys

saw the British patent of the Remington machine. But there was nothing in it to indicate that the design had been made within the year. Plaintiff thus had no knowledge of defendant's wrong-doing sufficient to estop it from denying its acquiescence in the appropriation by defendant of any invention made by Fuller within the year.

Defendant was not misled to its detriment by reliance on any act or omission of plaintiff. It acted in hostility to plaintiff's known rights. Whatever delay there was did not harm defendant. In the language of Judge Collin in *Rothschild* v. *Title Guarantee & Trust Co.*, 204 N. Y. 458, 461: " The law does not withdraw its remedies from a person against whom a wrong is committed merely because he in silence and without proclamation or complaint recognizes and endures the wrong."

In *Todd Protectograph Co.* v. *Safe-Guard Check Writer Co.*, 291 Fed. Rep. 613, 616, Judge Learned Hand writes: " The defendant in such cases is a wrongdoer, and he must not escape merely because the plaintiff does not at once raise hue and cry. * * * I cannot regard a man as getting a vested interest in the right to commit a tort, because merely of his victim's inaction within the statutory period."

Plaintiff waited to strike until it was in a reasonably safe position to prove the commission of the wrong. Its slight and harmless delay does not subject it to a forfeiture of its property.

Judgment for plaintiff.

Judgment accordingly.